NOV 9 2020 PM 1:31
FILED-USDC-CT-HARTFORD

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

**ELISSA SPEER**

**3:19-cv-01778-AWT**

**VS**

**DANJON CAPITAL, INC**
**TINA HAMPTON**
**HOGAN HULET PLLC**
**WORLD BUSINESS LENDERS, LLC**
**WBL SPE II LLC**

## AMENDED COMPLAINT

The Plaintiff, Elissa Speer, complains to the best of her knowledge and belief, as follows:

### I. Jurisdictional and Venue Allegations

1. The Plaintiff seeks recovery under 18 USC §1964(c) for wire fraud (18 USC §1343), Money Laundering (18 USC §1956), Operating and which is defined as "Racketeering Activity" pursuant to 18 USC §1961). Federal Courts have jurisdiction under all cases involving a Federal Question, which this one does pursuant to 28 USC §1331. This Court has supplemental jurisdiction to hear Connecticut law claims alleged herein as well.

2. The Parties are a citizen of Connecticut (the Plaintiff) and Nevada (the Defendants, except for World Business Lenders, LLC ("WBL"), a New Jersey LLC, and WBL SPE II LLC ("WBL II")), and the amount of controversy exceeds $75,000, thereby invoking 28 USC §1332. This Court may exercise jurisdiction over the

Defendants because the matters complained of involve their: (1) transactions within this State; (2) their tortious acts commited within this State; and (3) title and interest in real property within Connecticut affected thereby and by virtue of the foregoing, thus fulfilling the requirements of CGS §52-59(b) to establish in personam jurisdiction.

3. Danjon Capital, Inc. ("Danjon", and "Danjon Defendants" meaning Defendants Hogan, Hampton and Danjon, collectively) is a Nevada Corporation and has a principal place of business at 800 Rainbow Blvd Suite 125, Las Vegas, NV 89107. Defendant Tina Hampton is an employee/agent of Danjon.

4. Hogan Hulet PLLC ("Hogan") is a law firm and has a principal place of business at 1140 N Town Center Dr Suite 300, Las Vegas, NV 89144.

## II. General Allegations

5. The Plaintiff sought a loan from Danjon Capital, Inc. For a loan of over the amount of $30,000 in May of 2016. As collateral, Defendant Tina Hampton, at the behest of Danjon, required the Plaintiff to grant it a mortgage on real property, and the Plaintiff executed a Note referencing that same mortgage. Prior to entering into the loan, the Plaintiff paid finder's fees of $5,000 in the aggregate to two different third parties in order to be put in touch with Danjon Capital. Defendant Danjon used, among other front entities, an organization called "Corporate Capital" as a front for its operation. To be introduced to the front network, the Plaintiff paid approximately $2,500 to a "Tom Kish", that purportedly worked for or did business as "Business Funding Network". On information and belief, the Plaintiff alleges that the finders and

origination fees paid to the Defendants' Racketeering Enterprise by those similarly situated to the Plaintiff are source for funds for which it initially disburses to those similarly situated to intiate illegal loans with extortionate terms in order to secure collateral on real as well as chattel property upon which the Enterprise later seeks executions, foreclosures and other means of recovery on. The Plaintiff reserves the right to amend or update this Amended Complaint in the event it is discovered there are additional actors.

6. After executing the Note and Mortgage (Both Exhibit A), Hampton and Danjon refused to release the $30,000 unless the Plaintiff executed a second contract, a lease agreement. The Defendants already had the executed Note and Mortgage in hand, and fully intended to have the mortgage recorded, which they did. The Plaintiff was instructed by Hampton to provide a list of equipment owned by her business (equipment in her control and possession), who, according to the second contract, would become Danjon's supplier, and who would in turn lease it to her. The "list of equipment" (copy of handwritten version supplied, Exhibit C) consited of:

# Exhibit "A"

EQUIPMENT SUPPLIER and EQUIPMENT DESCRIPTION

SUPPLIER NAME: JEM Contracting Co., LLC
BILLING ADDRESS: 151 Talman Street N., Norwich, CT 06360

TELEPHONE: 860-861-8130
FAX:

| | |
|---|---|
| 1 | Property Maintenance Equipment |
| 1 | Socket Sets, Drill Bits, Wrenches |
| 1 | Appliances – Stoves, Refrigerators, Washers & Dryers |
| 1 | Landscape Equipment |
| 1 | Scagg Mower |
| 1 | Ladders & Scaffold |
| 1 | 8' Sections Staging W/Braces |
| 2 | Fiberglass 28' Extension Ladder |
| 1 | Fiberglass 40' Extension Ladder |
| 2 | Leaf Blower (Backpack Gas) |

7. Defendants Danjon and Hampton are not licensed in banking, money transmitting or loan origination, and never were at any time alleged herein. They, and Defendant Hogan (Complaint in Las Vegas Court, Exhibit B), have attempted to collect additional illegal and usurious fees from the Plaintiff as consideration for initiating the term of repayment and also throughout. These included the origination fee of $1770, which Danjon extracted up front, on Day One of the Loan. Although the face value of the Note is $30,000, the Defendants employed the use of Nevada Courts (a jurisdiction without any usury laws) and claimed a total of $112,761.26 to be owed, falsely representing even the terms of the bait and switch lease contract as one for "restaurant equipment". After failing failing to secure sufficient lending amounts, Defendant Hampton referred the Plaintiff to Defendant World Business Lenders, LLC. At no time did the Danjon Defendants disclose to the Plaintiff that they were affiliated

with the WBL Defendants.

8. All Defendants operate in a scheme to offer distressed or unqualified borrowers who own or have an interest in real property and/or other chattel property payday loans with payday loan type terms, with interest rates that well exceed Connecticut's (and other jurisdictions') usury statutes, that is, after having one or more front entities or organizations charge them exhorbitant finder's fees. After securing said loans with the initial Note and Mortgage, the Danjon Defendants then force the creation of a second, false lease contract in order to disguise the mortage loan as a commercial lease agreement for restaurant equipment. The objective of this scheme is, once the loan defaults, to have Defendant Hogan bring or threaten to bring suit in Las Vegas County in order to evade usury laws, obtain a judgment on the artifice that is the fake restaurant lease contract and then subsequently benefit from the mortgage already obtained on real property, after which the Enterprise disposes of the acquired real and chattel property in furtherance of its scheme complained of herein.

9. In their haste to solidify their fraudulently induced hold on the Plaintiff and equity in real property she had access to, Defendants Danjon and Hampton induced her to sign a Note that claims it was "entered into in the State of California and shall be deemed to have been made under and shall be governed by federal law and, except to tne extent preempted by federal law, by the laws of the State of California in all respects, including matters of construction, validity and performance. Any action, suit or proceeding relating to this Promissory Note or any guaranty or endorsement of

this Promissory Note may be instituted and prosecuted in the state or federal courts of fhe State of California". The terms of the Note function well in excess of interest beyond 400%, yet California's constitution limits interest rates to seven percent.

10. The Plaintiff never was or presently is in the restaurant business. All the Defendants, at all times herein, knew that the Plaintiff never was or presently is in the restaurant business. None of the items in the purported list of equipment leases, including but not limited to the two leaf blowers, have any safe, practical or functional use in the restaurant business.

11. If the consumer signs the loan documents (the Note and Mortgage, as the Plaintiff had) and transmits them via facsimile, the precondition to going forward with the transaction is to enter into the fake restaurant lease equipment agreement. Said Second Agreement's terms specifically and emphatically waive rights and remedies under applicable consumer statute and critical prejudgment remedy protections.

12. The cost of the Plaintiff's loan the Danjon Defendants, through fraud on the inducement at first and later on by false representation to the Clark County Nevada Court, was criminally extortionate. This included an origination fee of $1,770, which Danjon extracted up front, on Day one of the Loan. Both the Note and the Fraudulent Lease called for identical weekly payments in the amount of $1,018.69, with late fees being the higher of $300 or any unpaid portion of the payment not made. The annual percentage of the loan exceeds 400 percent. The Note also provides for $5,000 in additional fees that are deferred until July 2017, which also take effect if the Note is

not paid in full by that date. The Danjon Defendants claimed compensatory damages "in excess of $15,000" for equipment that they never owned, they never purchased, they never controlled and never even existed within the State of Nevada. $112,761.26 was claimed to be owed in total under the fraudulent lease agreement.

13. Prior to the Plaintiff discovering or learning of the Danjon Defendants' initial scheme complained of herein, the Danjon Defendants, for again another referal fee and in collusion with WBL, fraudulently induced the Plaintiff into a second loan, fraudulently inducing her to sign as gaurantor and grant a Note and Mortgage ("WBL Note" and "WBL Mortgage") on real property known as 526-528 North Main Street in Norwich, Connecticut, purportedly on funds lent from the Bank of Lake Mills, a Wisconsin bank. (See Exhibit D). The Plaintiff also had to pay a fee to World Business Lenders, LLC regardless of whether or not it would offer the WBL Mortgage.

14. The terms of the WBL Note and Mortgage were similarly astronomical to that of the Danon Note and Mortgage, resulting in interest ultimately charged of over 121% (ultimately over $85,000) to borrow $20,000 (in addition to a "prepayment penalty" of $10,679.42 at over 53% interest), which WBL used a highly inflated appraisal (which does not purport to be USAP compliant and for which the Plaintiff was charged by WBL $1,200 to conduct) to originate and then fraudulently repackage and resell on the secondary debt market. The broker price opinion that WBL generated in house to release the funds from Bank of Lake Mills in furtherance of its fraudulent scheme listed the property as in "fair" condition, with satellite photos clearly showing

holes in the roof and the interior pictures evidencing an outright uninhabitable structure. In order to conceal WBL's conduct complained of herein, it subsequently transferred the WBL Note and Mortgage to a shell entity it owned and controlled, Defendant WBL II, which proceeded to attempt unlawful actions to enforce.

15. Connecticut's relevant usury statute, CGS §37-4, states, "No person and no firm or corporation or agent thereof, other than a pawnbroker as provided in section 21-44, shall, as guarantor or otherwise, directly or indirectly, loan money to any person and, directly or indirectly, charge, demand, accept or make any agreement to receive therefor interest at a rate greater than twelve per cent per annum.", which the Defendants did in this State, and secured by a mortgage on real property in this State, and to which the exceptions of CGS §37-9 do not apply.

16. The Defendants have not only engaged in the business of making residential mortgage loans and acted as a mortgage broker without the statutorily required mortgage lender, mortgage broker and mortgage loan originator licenses, but have also violated the Commissioner's orders, made false statements to the Commissioner, and deprived consumers of significant statutory protections, including, inter alia, by failing to provide required residential lending disclosures.

17. The Defendants have imposed numerous and excessive, unscrupulous, oppressive, unconscionable, and unfair up-front fees and finance charges upon residential loan borrowers and non-residential loan borrowers in violation of CUTPA.

18. The Defendants have imposed numerous and excessive, unscrupulous,

oppressive, unconscionable, and unfair up-front fees and finance charges upon residential loan borrowers and non-residential loan borrowers in violation of CUTPA.

19. The Defendants have also acted as a mortgage servicer without obtaining the statutorily required mortgage servicer license from the Banking Commissioner.

20. The Defendants acted as a loan servicer for mortgage loans, as well as non-residential mortgage loans, including by collecting payments from borrowers and communicating with borrowers regarding loan balances, delinquencies, and defaults, and forwarding borrower payments to third-party investor/assignees.

21. The Defendants have, in some instances, failed to properly account for monies while acting as a mortgage lender and servicer for both residential and non-residential mortgage loans in this State, including by failing to pay contractors monies that were withheld for such purposes and failing to remit monies collected from borrowers for property taxes to the appropriate taxing authority, in violation of CUTPA.

22. The acts and practices described herein occurred in trade or commerce in the State of Connecticut.

23. The acts and practices described herein have caused substantial injury to borrowers.

24. All Defendants have engaged in the acts or practices alleged herein when he knew or should have known that his conduct was unfair and deceptive, in violation of CGS §42-110b(a)

25. All Defendants, in deliberately making and marketing loans to other state

jurisdictions secured by real property in them, including Connecticut, and then seeking to enforce fraudulently created contracts in Nevada and Wisconsin, have actively, knowingly and wilfully attempted to circumvent all sorts of usury, lending and financial regulatory laws and frameworks. The Defendants all continue to profit from and utilize the proceeds therefrom, which have been obtained by the use of telecommunications, wire and mail and across state lines throughout the United States. The Defendants engage in this activity with a common purpose, a common enterprise and a long standing enterprise that preexisted the transaction they fraudulently induced the Defendant into and then unlawfully attempted to enforce.

26. In doing so, the Defendants not only defrauded the Plaintiff into the Note and Mortgage, but continued to defraud the Plaintiff into a Lease agreement, and collected extortionate fees up front in addition to extortionate payments thereafter, the proceeds of which one or more or all Defendants kept, were unjustly enriched by and utilized in the furtherance of their common Racketeering enterprise, knowing that the proceeds therefrom were the product of their unlawful conspiracy complained of herein.

27. In doing so, the Defendants own or control and profit from an unlawful enterprise that operates as an unlicensed money transmitting business, which operates across state lines, without any lending, banking or any other financial business license offered by any State or through the United States government, and knowingly involved interstate financial transactions that included the one complained

of with the Plaintiff. Aforesaid unlawful enterprise thrives and allows other participants to engage in and invest in and profit in its scheme by: (1) improperly abusing the Nevada  and other State Courts to obtain fraudulent judgments, which are sold, transferred and/or hypothecated, and that could otherwise be used or utilized as tax write offs or credits when said debt is forgiven or rendered foreseeably uncollectible; and (2) fraudulently obtaining interest in real property throughout the United States, which are sold, transferred and/or hypothecated, and that could otherwise be used or utilized as a means to establish an accounting basis in which to raise capital to further the Defendants' Racketeering Enterprise; and (3) extorts sufficient up front finder's fees through shell entities/alter egos and additional charges through up front extortionate origination fees to provide sufficient operating capital and liquidity.

28. After engaging in or aiding and abetting in all of the above activities, the Danjon Defendants then commenced a civil action in Clark County Nevada to collect the illegal loan disguised as a restaurant equipment lease, plus all purported costs and interests, from the Defendant, seeking a total sum now in excess of $112,761.26.

29.  After engaging in or aiding and abetting in all of the above activities, WBL commenced a foreclosure action in Connecticut to collect the fees and charges specified in ¶13, which it assigned all interest in to its alter ego, WBL II. On information and belief, the two corporate entities have no real distinct and seperate existence of their own, but are rather corporate fictions set up for the purpose of evading responsibility for the acts complained of herein.

### III. Specific Counts

### Count One – Civil RICO 18 U.S.C. §1962(d): Unlawful Collection of Debt, Speer vs Defendant Danjon Capital

30. As complained of in parapraphs 1-29, the Defendant conspired to issue and then collect on usurious, and thus illegal, loans. Section 1962(d) if Title 18 "prohibits any person from conspiring to violation subsections (a), (b), or (c)."

31. This  an endeavor which, if completed, would, and upon its completion, did constitute a violation of  Section 1962(d) if Title 18. Section 1962(c) prohibits any person employed by or associated with an enterprise engaged in interstate commerce from conducting or participating in the affairs of the enterprise through a pattern of racketeering activity "or through collection of an unlawful debt.

32. The Defendants jointly and seperately conducted an enterprise to advertise, solicit, open, broker and service loans in violation of the Usury, Banking, Finance and Lending Laws of Connecticut, including the loan complained of and made to the Plaintiff and in a manner that preexisted the Plaintiff's loan.

33. The Defendant's pattern of Racketeering Activity employed the use of wire and mail to fraudulently induce the Plaintiff and others so similarly situated to act, and those financially desperate to act, and she and others so did, and not only agreed to the extortionate loan terms, but also to sign onto the the artifice restaurant equipment agreement.

34. The aforesaid loans, unlawful debts, which are a product of fraud and violate public policy, good conscience and sound consumer protection and banking

law, are unenforceable as a matter of CGS §37-4 (and whose interest rate is well beyond twice the usurious rate of interest set by Connecticut Law), CGS §42-110(a).

### Count Two – Civil RICO 18 U.S.C. §1962(d): Unlawful Collection of Debt, Speer vs Defendants World Business Lenders and WBE II SPE

35. As complained of in parapraphs 1-29, the Defendants conspired to issue and then collect on usurious, and thus illegal, loans. Section 1962(d) if Title 18 "prohibits any person from conspiring to violation subsections (a), (b), or (c)."

36. This  an endeavor which, if completed, would, and upon its completion, did constitute a violation of  Section 1962(d) if Title 18. Section 1962(c) prohibits any person employed by or associated with an enterprise engaged in interstate commerce from conducting or participating in the affairs of the enterprise through a pattern of racketeering activity "or through collection of an unlawful debt.

37. The Defendants jointly and seperately conducted an enterprise to advertise, solicit, open, broker and service loans in violation of the Usury, Banking, Finance and Lending Laws of Connecticut, including the loan complained under the Note and Mortgage set forth as Exhibit D, made to the Plaintiff and in a manner that preexisted the Plaintiff's loan.

38. The Defendant's pattern of Racketeering Activity employed the use of wire and mail to fraudulently induce the Plaintiff and others so similarly situated to act, and those financially desperate to act, and she and others so did, and not only agreed to the extortionate loan terms, but also to sign onto the the artifice restaurant equipment

agreement.

39. The aforesaid loans, unlawful debts, which are a product of fraud and violate public policy, good conscience and sound consumer protection and banking law, are unenforceable as a matter of CGS §37-4 (and whose interest rate is well beyond twice the usurious rate of interest set by Connecticut Law), CGS §42-110(a).

**Count Three – Civil RICO 18 U.S.C. §1962(d): Unlawful Collection of Debt, Speer vs Defendant Hogan Hulet**

40. As complained of in parapraphs 1-29, the Defendant conspired to issue and then collect on usurious, and thus illegal, loans. Section 1962(d) if Title 18 "prohibits any person from conspiring to violation subsections (a), (b), or (c)."

41. This an endeavor which, if completed, would, and upon its completion, did constitute a violation of Section 1962(d) if Title 18. Section 1962(c) prohibits any person employed by or associated with an enterprise engaged in interstate commerce from conducting or participating in the affairs of the enterprise through a pattern of racketeering activity "or through collection of an unlawful debt.

42. The Defendants jointly and seperately conducted an enterprise to advertise, solicit, open, broker and service loans in violation of the Usury, Banking, Finance and Lending Laws of Connecticut, including the loan complained of and made to the Plaintiff and in a manner that preexisted the Plaintiff's loan.

43. The Defendant's pattern of Racketeering Activity employed the use of wire and mail to fraudulently induce the Plaintiff and others so similarly situated to act, and those financially desperate to act, and she and others so did, and not only agreed to

the extortionate loan terms, but also to sign onto the the artifice restaurant equipment agreement, which Defendant Hogan Hulet's role was to memorialize and permanently solidify by bringing the action set forth by Exhibit B, and for which they had the spirit, purpose and intent of collecting on an unlawful loan.

44. The aforesaid loans, unlawful debts, which are a product of fraud and violate public policy, good conscience and sound consumer protection and banking law, are unenforceable as a matter of CGS §37-4 (and whose interest rate is well beyond twice the usurious rate of interest set by Connecticut Law), CGS §42-110(a).

**Count Four - Wire Fraud 18 USC §1964(c), Speer vs Defendants Danjon Capital and Tina Hampton**

45. As complained of in paragraphs 1-30, the Defendants voluntarily and intentionally devised or participated in a scheme to defraud the Plaintiff out of her money and into granting them an interest in real property located in Connecticut, and they did so with intent to so defraud her, and employed interstate wire communications in this scheme intending to so defraud her, and they have in fact so defrauded her employing such means, in violation of 18 USC §1343.

46. 18 USC §1964(c) states, "Any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee, except that no person may rely upon any conduct that would have been actionable as fraud in the purchase or sale of securities to establish a violation of section 1962. The exception

contained in the preceding sentence does not apply to an action against any person that is criminally convicted in connection with the fraud, in which case the statute of limitations shall start to run on the date on which the conviction becomes final."

47. The Defendants first employed the use of intermediary third party entities to first extract two seperate finder's fee payments of $2,500 apiece during early 2016 to put the Plaintiff in touch with Defendant Danjon, through use of interstate wire communications. Defendants Danjon and Hampton subsequently, through the use of interstate wire communications, presented the Note and Mortgage for the Plaintiff's execution (Exhbit A). Post execution of the Note and Mortgage, after receiving a grant of beneficial interest in real property by means of fraudulent inducement, the Defendants then next induced the Plaintiff into the fraudulent restaurant lease equipment agreement, which was a precondition the Defendants required of her – by and through the use of interstate wire communications – in order to receive the funds promised under the Note.

48. The purpose, intent and spirit of this artifice by the Defendants was to secure a real property interest in Connecticut by way of the documents set forth in Exhibit A, and then concurrently collect on the same debt more than twice by referring the action to Defendant Hogan Hulet (who advanced the complaint in Exhibit B) in a manner calculated to evade usury and other lending laws. The result of the artifice was intended to be that the criminal enterprise obtained the ability to collect on the same sums of money multiple times over by executions resulting from the Nevada

action AND foreclosure by Defendants World Business Lenders and WBE SPE II on the other end of real property in this State.

49. The inducement was designed to create an unpayable amount of debt that the Defendants' collective enterprise would attempt to collect multiple times in multiple actions in multiple forums.

**Count Five - Wire Fraud 18 USC §1964(c), Speer vs Defendants World Business Lenders and WBE II SPE**

45. As complained of in paragraphs 1-30, the Defendants voluntarily and intentionally devised or participated in a scheme to defraud the Plaintiff out of her money and into granting them an interest in real property located in Connecticut, and they did so with intent to so defraud her, and employed interstate wire communications in this scheme intending to so defraud her, and they have in fact so defrauded her employing such means, in violation of 18 USC §1343.

46. 18 USC §1964(c) states, "Any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee, except that no person may rely upon any conduct that would have been actionable as fraud in the purchase or sale of securities to establish a violation of section 1962. The exception contained in the preceding sentence does not apply to an action against any person that is criminally convicted in connection with the fraud, in which case the statute of limitations shall start to run on the date on which the conviction becomes final."

47. The Defendants first employed the use of intermediary third party entities to first extract two seperate finder's fee payments of $2,500 apiece during early 2016 to put the Plaintiff in touch with Defendant Danjon, through use of interstate wire communications. Defendants Danjon and Hampton subsequently, through the use of interstate wire communications, presented the Note and Mortgage for the Plaintiff's execution. Post execution of the Note and Mortgage, after receiving a grant of beneficial interest in real property by means of fraudulent inducement, the Defendants then next induced the Plaintiff into the fraudulent restaurant lease equipment agreement, which was a precondition the Defendants required of her – by and through the use of interstate wire communications – in order to receive the funds promised under the Note.

48. The inducement was designed to create an unpayable amount of debt that the Defendants' collective enterprise would attempt to collect multiple times in multiple actions in multiple forums.

**Count Six – Civil Rackteering: Laundering of Monetary Instruments 18 USC §1964(c), Speer vs Defendants Danjon Capital, World Business Lenders and WBE SPE II**

49. As complained of in paragraphs 1-29, the Defendants attempted to conduct and in fact did conduct financial transactions, including the ones the Plaintiff was fraudulently induced into, knowing that the property involved in the financial transaction represents the proceeds of some unlawful activity in violation of 18 USC §1956, and knowing that the sum of the value of: (1) the interest in the real property

the Plaintiff was fraudulently induced to grant the Defendants; plus (2) the extortionate origination and other fees fraudulently extracted from the Plaintiff by the Defendants; plus the foreseeable value of any civil judgment fraudulently obtained through the Nevada Courts the Defendants reasonably expected to unlawfully and under fraudulent pretenses extract from the Plaintiff or cause to be impaired or rendered unavailable to her; plus (3) the value of the equipment, title to which the Defendants fraudulently extracted from the Plaintiff by way of the fraudulent lease agreement all have an aggregate value well exceeding $20,000. CGS §53a-119 provides "A person commits larceny when, with intent to deprive another of property or to appropriate the same to himself or a third person, he wrongfully takes, obtains or withholds such property from an owner. Larceny includes, but is not limited to... (2) Obtaining property by false pretenses. A person obtains property by false pretenses when, by any false token, pretense or device, he obtains from another any property, with intent to defraud him or any other person." CGS §53a-122 states, in relevant part, "(a) A person is guilty of larceny in the first degree when he commits larceny, as defined in section 53a-119, and: (1) The property or service, regardless of its nature and value, is obtained by extortion, (2) the value of the property or service exceeds twenty thousand dollars...", making the fraudulent scheme felonious under Connecticut Law in its own right.

     50. The face value of the Danjon Note is $30,000.

     51. The face value of the WBL Note is $20,000.

     52. The Danjon Note, Mortgage and equipment lease the Plaintiff was fraulently

induced into constituted a A "transaction" is as defined in 18 USC §1956(c)(3), which involved ACH and wire payments and in which Defendants Danjon and Hampton not only knew to be illegally derived, but also helped initiate and conclude. Said transaction was a "financial transaction" for the purposes of 18 USC §1956(c)(4) because it  (1) involved the movement of funds by wire or by other means; (2) involved the use of the Note; (3) involved the transfer of interest in real property, and (4) involves the use of a financial institution which is engaged in, or the activities of which affect, interstate or foreign commerce.

53. Aforesaid unlawful enterprise further thrives and allows other participants to engage in and invest in and profit in its scheme by: (1) improperly abusing the Nevada Courts to obtain fraudulent judgments, which are sold, transferred and/or hypothecated, and that could otherwise be used or utilized as tax write offs or credits when said debt is forgiven or rendered foreseeably uncollectible; and (2) fraudulently obtaining interest in real property throughout the United States, which are sold, transferred and/or hypothecated, and that could otherwise be used or utilized as a means to establish an accounting basis in which to raise capital to further the Defendants' Racketeering Enterprise; and (3) extorts sufficient up front finder's fees through shell entities/alter egos and additional charges through up front extortionate origination fees to provide sufficient operating capital and liquidity.

54. The Defendants acted in the manner they did, in concert and collectively, to: (1) promote the carrying on of specified unlawful activity complained of herein in

violation of 18 USC §1956(a)(1)(A)(i); (2) with knowledge that the transaction was designed to conceal or disguise the nature, location, source, ownership or control of proceeds of the specified unlawful activity in violation of 18 USC §1956(a)(1)(B)(i); and (3) in violation of 18 USC §1956(a)(1)(B)(ii) with knowledge that the transaction was designed to avoid a transaction reporting requirement under State or Federal law

55. On information and belief, Defendants Danjon, World Business Lenders and WBE SPE II, LLC are commonly owned, held and/or controlled by the same Racketeering Enterprise whose mission is, as complained of, the creation of extortionate loan transactions and the laundering

56. On information and belief, and in order to further the scheme, WBE SPE II, LLC, transferred the property subject to the World Business Lenders Note and Mortgage to S & G Home Development, LLC, which is further believed to be an alter ego of the Defendants, involved in the Racketeering Enterprise and used to perpetrate and memorialize the frauds complained of herein.

**Count Seven - Connecticut Unfair Trade Practices Act CGS §42-110g, Speer vs Defendants Danjon Capital, Inc., World Business Lenders, LLC and WBE SPE II, LLC**

57. As complained of in paragraphs 1-29, the Defendants reached into the jurisdiction of Connecticut through the use of interstate telecommunications, and defrauded the Plaintiff and others similarly situated in order to: engage in activities determined to offend particular State and Federal Law as complained of herein, do so in a manner contrary to public policy and do so in a manner that is oppressive,

burdensome, unconscionable, unfair and notoriously deceptive.

58. The Note and Mortgage the Defendants have attempted to diguise as a restaurant equipment lease This included an origination fee of $1770, which Danjon extracted up front, on Day one of the Loan. Both the Note and the Fraudulent Lease called for identical weekly payments in the amount of $1,018.69, with late fees being the higher of $300 or any unpaid portion of the payment not made. The annual percentage of the loan exceeds 400 percent. The Note also provides for $5,000 in additional fees that are deferred until July 2017, which also take effect if the Note is not paid in full by that date. The Defendants claimed compensatory damages "in excess of $15,000" for equipment that they never owned, they never purchased, they never controlled and never even existed within the State of Nevada. $112,761.26 was claimed to be owed in total under the fraudulent lease agreement. On its face, this defies Connecticut's usury statute, which caps interest at twelve percent (12%) per annum.

59. The Defendants do not fit within any exception to the statue as contemplated by CGS §37-9, as, among other things, the Mortgage is not bona fide (as it is fraudulent on the inducement) and none of the Defendants have any license, charter or permission to conduct banking, loan servicing or any such activities in any capacity in this State. Moreover, the Defendants have acted in a manner so as to notoriously attempt all means of evasion of detection by Connecticut or Federal Banking regulators. The Defendants did so while expressly electing to engage in

business and commerce within the State of Connecticut, as evidenced by: (1) their business model, which is an equal opportunity attempt to secure any and all interest in real property by whatever deceptive pretense is available from the Plaintiff and those similarly situated to her; (2) their notorious employment of the fraudulent use of interstate telecommunications and wire means to effectuate the acts complained of; and (3) the Defendants' choice to accept and then record its fraudulently obtained interest an real property in the State of Connecticut, which the Plaintiff would ask this Court to extinguish or rule otherwise invalid.

60. The manner in which the Loan and its immediately subsequent transactional disguise, the fraudulent restaurant lease contract, was an artifice designed to defeat reporting and disclosure requirements under the Connecticut Truth in Lending Act, the Real Estate Settlement Procedures Act, the Fair Credit Reporting Act and all other manner and sort of consumer protection laws. Rather than go through the proper steps, set up an agent for service, register with the Secretary of State and Commissioners of Banking and Consumer Protection, the Defendants simply employed rogue, high pressure, deceptive and unlawful means to in an intentional, knowing campaign to defeat or circumvent the Law of this State.

61. A copy of this Complaint will be served on the Attorney General as required by Law.

WHEREFORE, the Plaintiff claims:

A. Damages and Costs
B. Damages and Punitive Damages pursuant to CGS §42-110g
C. Damages Pursuant to 18 USC §1964
D. Declaratory Relief that the Danjon and WBL Notes and Mortgages are fraudulent and Void
E.  Appointment of a Receiver to Secure the Defendants' Assets in this Jurisdiction
F. Any Other Relief the Court Deems Proper


Respectfully Submitted,


_Elissa Speer_
Elissa Speer
50 Sunnyside Ave
Norwich, CT 06360

Dated this 6th Day of November, 2020

CERTIFICATE OF SERVICE

I, Elissa Speer, certify that a copy of this document was sent to the following counsel of record through the ECF filing system, upon its entry by the clerk:

Elissa Speer

Jonathan Einhorn, via einhornlawoffice@gmail.com

Eva Kolstad via ekolstad@morrisonmahoney.com

Michael Keller via mkeller@morrisonmahoney.com

Adam Lewis via alewis@oamlaw.com